Hinkle, J.
This is an action by the City of Boston and the Boston Public Health Commission against various firearms manufacturers, distributors, sellers and promoters, including firearms industry trade associations.[3] In a detailed six-count complaint,[4] Plaintiffs seek to recover damages allegedly sustained through conduct of Defendants.[5] Briefly stated, Plaintiffs allege that Defendants, through a strategy of willful blindness, exploit and rely upon for profit an illegal, secondary firearms market of juveniles, criminals and other unauthorized gun users in Boston. Plaintiffs allegedly bear immense costs arising from this market. Plaintiffs also allege that Defendants design guns without readily available safety devices and fail to warn of certain dangers.
The matter is before the court on the motion of the manufacturing defendants to dismiss the First Amended Complaint under Mass.R.Civ.P. 12(b)(6) for failure to state a claim. After a hearing, for the reasons discussed below, the motion to dismiss is ALLOWED in part and DENIED in part.[6]
BACKGROUND
The factual allegations contained in the First Amended Complaint,[7] as relevant to each of the theories of liability, are summarized as follows.[8] For clarity, additional factual allegations are set forth in the discussion section where pertinent.
Plaintiffs allege that Boston faces a high level of violent crime[9] involving guns manufactured by Defendants.[10] Easy movement of firearms from the legal marketplace to unauthorized and illegal users,[11] through an illegal, secondary firearms market, fuels the gun violence.[12]
Plaintiffs also allege that the flow of firearms into the illegal market and into the hands of unauthorized users in Boston has occurred in ways Defendants knew or should have known. Plaintiffs claim that Defendants could have taken action to control and prevent the illegal diversion. The methods of illegal diversion include, according to Plaintiffs: (1) straw purchases, which occurred under circumstances which indicated or should have indicated to the dealer that a straw purchase was being made; (2) multiple sales (where a purchaser buys more than one gun, at one time or over a short period, from a licensed dealer with the intent of conveying the gun to another person not qualified to purchase guns), occurring under circumstances which indicated or should have indicated to the seller that the gun was destined for the unlawful market;' (3) sales to “kitchen table” dealers (federally licensed dealers who do not sell from a retail store) by Defendants, even though Defendants knew or should have known that many of those dealers fail to perform background checks or otherwise illegally divert guns to the illegal market; (4) theft of guns from firearm dealers who failed to provide adequate security for their premises, where Defendants failed to ensure that persons distributing their products have implemented adequate security measures; (5) obliteration of serial numbers from guns, where Defendants, though aware of this problem, took no initiative to make their serial numbers tamper-proof; (6) movement of firearms from states with weak gun control laws to areas (such as Boston) with stronger laws; and (7) sales at gun shows, where background checks are usually not required. These guns are often used in more than one crime.
Plaintiffs allege that Defendants’ distribution system is reckless and has caused firearms to come into the hands of unauthorized persons, causing Plaintiffs direct harm.[13] Plaintiffs claim that Defendants.knew that their guns were distributed into the illegal, secondary market and knew that this market supplied a substantial percentage of firearms used to inflict harm upon Plaintiffs.[14] According to Plaintiffs, Defendants could have helped to prevent firearms they manufacture, market, distribute and sell from flowing into the illegal market and into the hands of unauthorized persons.[15]
Plaintiffs also claim that Defendants’ guns are unsafely designed in that Defendants fail to incorporate features which would inhibit unlawful access, transfer or theft by criminals, juveniles and other unauthorized users. The defective design results in thousands of unintentional deaths and non-fatal injuries per year, according to Plaintiffs.[16] Plaintiffs claim that failure to incorporate “personalized” gun technology (to prevent unauthorized or prohibited persons from obtaining access to and using guns) results in homicides and other crimes, some of which occur in Boston.
Plaintiffs claim that Defendants are in the best position to conduct research to correct the design of their guns. Plaintiffs allege that Defendants have been aware of the need for design features which would inhibit straw purchases, reuse of stolen weapons and *228 accidental discharges by unauthorized users, but that Defendants have failed to research, develop and implement feasible, available technology.
According to Plaintiffs, it has been reasonably foreseeable that Defendants’ guns would come into the hands of unauthorized users.[17] Plaintiffs claim that Defendants have been aware or should have been aware that, when unauthorized users gain access to Defendants’ guns, shootings may result. Unintentional shootings, suicides and crimes committed by juveniles and other unauthorized users could be prevented if Defendants implemented safer gun designs, Plaintiffs allege. Such designs, according to Plaintiffs, include built-in locking systems, magazine-discon - nect safeties and chamber-loaded indicators. Plaintiffs claim that Defendants knew that by failing to implement such safety designs, it was reasonably foreseeable that stolen guns could be employed by unauthorized or prohibited users in violent criminal acts. Plaintiffs claim that they have been repeatedly victimized by Defendants’ “unreasonably dangerous products."[18]
According to Plaintiffs, when Defendants manufactured, distributed, promoted, and/or sold these guns, they knew or should have known of the unreasonable dangers of the guns; Defendants knew of and had available to them safety devices or other measures which would decrease the dangers; Defendants are in the best position to correct the unreasonably dangerous design of their products, but have failed to remedy the deficiency and Defendants purposefully and intentionally engaged in their activities knowing that their products could be made to prevent firing by unauthorized users and knowing that Plaintiffs would be injured and forced to bear substantial expenses. Plaintiffs further allege that Defendants have acted in concert with each other in their failure to develop and implement safety features and implement proper warnings.
Plaintiffs claim that, to increase profits, Defendants have knowingly, purposefully, intentionally or negligently misled, deceived and confused Boston and its citizens regarding the safety of firearms. Defendants did this, Plaintiffs allege, by claiming falsely and deceptively through advertising that firearm ownership enhances security and that firearms are safe. Plaintiffs say that when Defendants made these claims, Defendants knew or should have known that studies and statistics show that presence of firearms in the home increases the risk of harm and that firearms without locking devices are unsafe.[19] Plaintiffs claim that, in Boston, numerous deaths and injuries have occurred when firearms were foreseeably used in unintentional shootings, suicides by teenagers, domestic disputes and other acts of violence.
Plaintiffs allege that Defendants’ conduct undermines the Commonwealth’s public policy regarding handguns. Plaintiffs further allege that Defendants’ conduct has caused Plaintiffs harm, including substantial financial costs for prevention, amelioration and abatement of the ongoing public nuisance caused by- Defendants; increased spending on law enforcement, emergency rescue services, increased security at public schools and public buildings, costs for coroner and funeral services for unknown victims, pensions, disability, and unemployment benefits, higher prison costs and youth intervention programs and lower tax revenues and lower property values.
DISCUSSION
The standard for evaluating the sufficiency of a complaint under Mass.R.Civ.P. 12(b)(6) is undisputed. The court must accept as true the allegations of the complaint, as well as any reasonable inferences to be drawn from them in the plaintiffs favor. Eyal v. Helen Broad Corp., 411 Mass. 426. 429 (1991). Plaintiffs “need only surmount a minimal hurdle to survive a motion to dismiss for failure to state a claim.” Bell v. Mazza, 394 Mass. 176, 184 (1985). A “complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.” Nader v. Citron, 372 Mass. 96, 98 (1977) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). “[A] complaint is not subject to dismissal if it would support relief on any theory of law,” Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 89 (1979) (citations omitted; emphasis in original), “even though the particular relief [which the plaintiff] has demanded and the theory on which he seems to rely may not be appropriate.” Nader, 372 Mass, at 104 (citations omitted). In addition, “[a] complaint should not be dismissed simply because it asserts a new or extreme theory of liability or improbable facts.” Jenkins v. Jenkins, 15 Mass.App.Ct. 934, 934 (1983).
In this case, Defendants argue that the complaint should be dismissed because the claims are substantively deficient and the claims are barred by reason of six defenses, namely (1) Boston’s harm is too remote to confer standing or establish proximate cause; (2) a municipality cannot obtain relief for the expenditure of funds to provide municipal services; (3) the economic loss rule bars recovery; (4) Plaintiffs improperly aggregate claims; (5) the Home Rule Amendment and the Firearms Act bar recovery and (6) the relief requested amounts to improper regulation of interstate commerce. Each issue will be addressed in turn.
I. The “Remoteness” Issue
Defendants argue that Plaintiffs’ claims are entirely derived from harm or threatened harm to others and, therefore, Plaintiffs cannot establish standing or show that Defendants’ alleged actions proximately caused the harm claimed.[20]
Proof of a causal relationship between a defendant’s action and a plaintiffs injury is essential in every tort. “Because the consequences of an act go endlessly forward in time and its causes stretch back to the *229 dawn of human history,” the concept of proximate causation was developed to limit the liability of a wrongdoer to only those harms with a reasonable connection to the wrongdoer’s actions. Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 235 (2d Cir. 1999), cert. denied, 120 S.Ct. 799 (2000) (hereafter “Laborers Local"). “[T]he notion of proximate cause reflects ‘ideas of what justice demands, or of what is administratively possible and convenient.’ ” Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268 (1992) (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts §41, at 264 (5th ed. 1984)).[21]
One way in which the concept of proximate cause operates is through the remoteness doctrine, which is sometimes called the direct injury test. Holmes, 503 U.S. at 268. This doctrine states that there must be “some direct relation between the injury asserted and the injurious conduct alleged.”[22] Id. Thus, in general, ”a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover.” Id. at 268-69 (citing 1 J. Sutherland, Law of Damages 55-56 (1882)).
This doctrine has been applied in Massachusetts.[23] In the “classic”[24] case of Anthony v. Slaid, 11 Met. (52 Mass.) 290, 291 (1846), the plaintiff, for a fixed annual compensation, contracted to support the poor of a Massachusetts town. After incurring increased expense in caring for a pauper who was the victim of an assault and battery, the plaintiff sued the party responsible for the attack.[25] The Supreme Judicial Court held that the injury to the plaintiff, which derived entirely from the pauper's injuries, was too remote and indirect because the relation between the plaintiff and the pauper was based on a “special contract” rather than as a “natural and legal relation.” Id.
The Supreme Judicial Court took occasion to explain Anthony in Chelsea Moving & Trucking Co. v. Ross Towboat Co., 280 Mass. 282 (1932). In that case, the injured victim’s employer sought to recover from the tortfeasor for tire employer’s loss, which resulted from the victim-employee’s decreased work ability, which in turn had resulted from the tortfeasor’s negligence. Holding that the injury to the employer was too remote, the Court emphasized that the relationship between the original victim and the plaintiff was based on contract. Id. at 287. In contrast, where the plaintiffs loss is the effect of a natural and legal relationship, such as a parent-child relationship, that loss is not too remote. Id. at 284; Balian v. Ogassin, 277 Mass. 525, 531 (1931) (father’s damages — medical expenses incurred in treatment of injured son — not too remote that father could not recover from tortfeasor); Dennis v. Clark, 2 Cush. (56 Mass.) 347, 354-55 (1848) (same).
Similarly, the Supreme Judicial Court held, the relationship between a master and an apprentice was so important and so like a parent-child relationship that the master could recover for injuries to the apprentice. whose services the master lost. Chelsea Moving & Trucking Co., 280 Mass. at 284-85 (citing Ames v. Union Ry. Co., 117 Mass. 541 (1875)). The reason for this distinction, the Court said, was that the injury to an employer “is not the natural and probable consequence of the ordinary tort.” Id. at 287. Thus, the employer's injury was too remote because it was not foreseeable to the tortfeasor, who did not know of the contract. Had the tortfeasor known of the contract, a different result may have obtained:
It is not alleged that there was any knowledge on the part of the defendant of the contract between [the employee] and the plaintiff or that the negligence of the defendant had any relation to such knowledge. There is no allegation of malice on the part of the defendant toward the plaintiff or toward anybody. There was no negligent interference with a contract. There is no allegation of deliberate design by the defendant to accomplish a definite end regardless of consequences to others. If elements of that nature were present a quite different question would be presented.
Id. at 286. See also Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 309 (1927) (tortfeasor not liable to another “merely because the injured person was under a contract with that other, unknown to the doer of the wrong").
From these cases, it is apparent that a plaintiff cannot recover from a defendant when the plaintiffs loss arises from harm the defendant caused to the injured party, absent some special relationship between the plaintiff and the injured party or, perhaps, an ordinary contract relationship of which the defendant knew.[26] There is no proximate cause under those circumstances because the plaintiffs harm is too “remote.”
The cases the parties cite show that a plaintiffs harm arises from harm to a third party when it is “purely contingent on” or “wholly derivative of’ harm to the third party.[27] Laborers Local, 191 F.3d at 236 & 237. Holmes itself was a case of “harm flowing merely from the misfortunes visited upon a third person by the defendant’s acts.”[28] Holmes, 503 U.S. at 268, 269-70.
In this case, the principal portion of the complaint alleging harm states:
Defendants’ conduct has caused [Plaintiffs] to incur public costs to respond to both intentional and accidental gunshot injuries. The harm to [Plaintiffs] includes substantial financial costs necessary for prevention, amelioration and abatement of the ongoing public nuisance caused by [Defendants. Moreover, [Plaintiffs] ha[ve] suffered economic injury as a result of increased spending on, among other things, law enforcement, emergency rescue services, increased security at public schools and *230 public buildings, costs for coroner and funeral services for unknown victims, pensions, disability benefits, unemployment benefits, higher prison costs, and youth intervention programs. Boston has further been damaged by lower tax revenues and lower property values.
Compl. at par. 76.[29]
This alleged harm is in large part not “wholly derivative of’ or “purely contingent on” harm to third parties. Unlike the harm alleged in the cases discussed above, which would not have existed without harm to a third party, harm to Plaintiffs may exist even if no third party is harmed. For example, Plaintiffs allege that Defendants’ conduct places firearms in the hands of juveniles causing Plaintiffs to incur increased costs to provide more security at Boston public schools. Thus, wholly apart from any harm to the juvenile (who may even believe himself to be benefited by acquisition of a firearm), and regardless whether any firearm is actually discharged at a school, to ensure school safety Plaintiffs sustain injury to respond to Defendants’ conduct. Even if no individual is harmed, Plaintiffs sustain many of the damages they allege due to the alleged conduct of Defendants fueling an illicit market (e.g., costs for law enforcement, increased security, prison expenses and youth intervention services). Similarly, diminished tax revenues and lower property values may harm Plaintiffs separately from any harm inflicted on individuals.[30] Plaintiffs’ harm is in essence the type of harm typically suffered by municipalities due to public nuisances. Cf. White v. Smith & Wesson, 97 F.Sup. 2d (ND. Ohio 2000), 2000 WL 664176 at *6. Indeed, much of the harm alleged is of a type that can only be suffered by these plaintiffs.
To be sure, Plaintiffs do allege injuries that arise from harm to others. Plaintiffs allege, for example, increased costs for emergency medical services, funerals, pensions, disability and unemployment benefits and lost productivity of citizens and employees harmed by guns. In addition, some of the injuries not necessarily derivative of harm to others may be exacerbated if individuals themselves are harmed. Two points need be made on this.
First, the remoteness doctrine, as it appears to exist in Massachusetts, contains an exception in cases of a special relationship between the plaintiff and the injured third party, such as a parent-child relationship or a close master-apprentice relationship, Chelsea Moving & Trucking Co., 280 Mass. at 284-85. An additional exception may arise where the plaintiff and the injured third party, while not in a special relationship, have a relationship of which the defendant knew, or in cases where the defendant acted with malice or with a “deliberate design ... to accomplish a definite end regardless of consequences to others.” Id. at 286. As governmental bodies, Plaintiffs may have the type of special relationship that puts this case within the first exception to Anthony (if such an exception exists), and the complaint's allegations are sufficient to place the case within the second Anthony exception (if this exception exists).
The uncertainty about the state of the law expressed in the above paragraph raises the second point. It is settled law that a complaint should not be dismissed “simply because it asserts a new or extreme theory of liability or improbable facts.” Jenkins v. Jenkins, 15 Mass.App.Ct. 934, 934 (1983). A motion to dismiss is not an appropriate vehicle for “resolvíing] undecided points of substantive law[.]” M. Aschheim Co. v. Turkanis, 17 Mass.App.Ct. 968, 968 (1983).
Nearly all the cases to which the parties refer which apply the remoteness doctrine are non-Massachusetts cases.[31] While the Anthony case appears to be the ultimate source of the remoteness doctrine, the contours of that doctrine are ill-defined in Massachusetts. Even if Plaintiffs’ allegations present an extreme theory of liability, a motion to dismiss is not the proper vehicle to challenge the theory.[32] See New Eng. Insulation Co. v. Gen. Dynamics Corp., 26 Mass.App.Ct. 28, 30 (1988).[33]
In sum, Plaintiffs’ allegations are not, as a matter of law, barred by “remoteness.”
II. The Free Public Services Issue
Defendants argue that the complaint should be dismissed because a municipality may not recover costs of providing public services. The principal Massachusetts case on which Defendants rely is Town of Freetown v. New Bedford Wholesale Tire, Inc., 384 Mass. 60 (1981). The court does not read Freetown as broadly as do Defendants.[34]
In Freetown, the plaintiff town alleged that the defendants negligently dumped 750,000 used tires on town land. A fire broke out, and the town’s fire department “incurred greater expense than usual and necessary” in extinguishing the fire. Id. at 61. The town sought to recover for the defendant’s alleged negligence or misrepresentation. The Supreme Judicial Court held that the town could not recover because the costs of controlling that type of fire were to be borne by the town. The Court noted that the establishment and maintenance of a fire department is for the benefit of the public. Implicit in the Court’s decision is the determination that the costs of this public benefit are to be carried by the public as a whole, absent a contrary statute.
In this respect, Freetown is consistent with the other cases to which Defendants refer. In City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co., 719 F.2d 322, 323 (9th Cir. 1983), the plaintiff city incurred great public expense after the defendant’s train, containing liquefied petroleum gas, derailed. The Ninth Circuit (predicting Arizona law on an issue of First impression) held that the city could not recover its costs.
*231 [T]he cost of public services for protection from fire or safety hazards is to be borne by the public as a whole, not assessed against the tortfeasor whose negligence creates the need for the service. Where such services are provided by the government and the costs are spread by taxes, the tortfeasor does not expect a demand for reimbursement.
Id. (citation omitted). The court noted that while sometimes “new tort doctrines are required to cure an unjust allocation of risks and costs,” such is not the situation “where a fair and sensible system for spreading the costs of an accident is already in place.” Id. In addition, the court said, the state legislature had chosen to allocate to the government the costs in question, and the court doubted that judicial intervention was needed to call the attention of the state legislature to “the cost allocation presented by what we find to be the existing rule, for the state and its municipalities presently feel the pinch when they pay the bill.” Id. at 324.
Similarly, in Township of Cherry Hill v. Conti Constr. Co., 218 N.J.Super. 348, 349, 527 A.2d 921 (N.J.Super.Ct.App.Div. 1987), where the plaintiff town sought to recover expenses (largely police overtime) incurred when the defendant ruptured a natural gas main, recovery was barred. “Government has traditionally assumed the ultimate cost of providing basic emergency services that protect the community.” Id. "(T]he policy decision is that it would be too burdensome to charge all who carelessly cause or fail to prevent fires with the injuries suffered by the expert retained with public funds to deal with those inevitable, although negligently created, occurrences.” Id. (quoting Krauth v. Israel Geller & Buckingham Homes, Inc., 31 N.J. 270, 274, 157 A.2d 129 (1960) (applying firefighter’s rule, which shifts to taxpayers financial responsibility for firefighter’s or police officer’s injury)). See also District of Columbia v. Air Florida, Inc., 750 F.2d 1077, 1078, 1080 (D.C. Cir. 1984) (district must bear costs arising from crash of airplane); County of Lassen v. State, 4 Cal. App. 4th 1151, 1154, 1156, 6 Cal. Rptr.2d 359 (Cal.Ct.App. 1992) (county must bear costs of defending inmate suit).
What each of these cases has in common is that the acts causing the damage were of the sort the municipality reasonably could expect might occur, and each of the results was a discrete emergency. Fires, fuel spills and ruptured gas mains are all frequent happenings which, while every effort is made to prevent them, can be expected to occur. Train derailments and airplane crashes are more unusual, but not so rare that a municipality can never expect to have to respond to such an emergency. The cases thus stand for the principle that such contingencies are part of the normal and expected costs of municipal existence, and absent legislation providing otherwise are costs to be allocated to the municipality’s residents through taxes. In addition, in those cases there is no evidence that the specific defendants had engaged in a repeated course of conduct causing recurring costs to the municipality.
This case is different. Plaintiffs allege wrongful acts which are neither discrete nor of the sort a municipality can reasonably expect. Plaintiffs allege that Defendants maintained and exploited an illegal firearms market, knowing that the market would and did cause Plaintiffs harm. Defendants’ argument based on Freetown thus fails because that case and other cases applying the same doctrine do not extend the rule as far as Defendants contend. Accord City of Flagstaff, 719 F.2d at 324 (“Recovery has also been allowed where the acts of a private party create a public nuisance which the government seeks to abate”).
III. The Economic Loss Rule
Defendants argue that Plaintiffs’ claims are barred by the economic loss rule, which prohibits recovery in negligence for purely economic loss. Clark v. Rowe, 428 Mass. 339, 342 [1998]. The rule provides that
. . . when a defendant interferes with a contract or economic opportunity due to negligence and causes no harm to either the plaintiffs person or property, the plaintiff may not recover for purely economic losses. Garweth Corp. v. Boston Edison Co., 415 Mass. 303, 305 (1993).
Priority Finishing Corp. v. LAL Constr. Co., 40 Mass.App.Ct. 719, 719 n.2 (1996).
Analytically, the economic loss rule occupies an uncertain legal position. Marking the boundary between tort and contract law, the rule may be seen as functionally part of the causation analysis and a limit on boundless recovery. See John M. Palmeri & Monty L. Barnett, The Continuing Vitality of the Economic Loss Rule, 31 Land & Water L. Rev. 757, 758-59 (1996). As such, it may be understood as part of the foreseeability element of proximate cause. Id. at 761-62. It may also be understood as going to whether there existed a duty to another person or class of persons. Id. at 765. A defendant’s fault appears to have some role in the economic loss rule. Id. at 761-62.[35] Additionally, as discussed below, the rule serves to separate tort and contract claims by encouraging parties to allocate risk contractually. In Massachusetts, the economic loss rule has been applied in cases where actions by a defendant interfered with a plaintiffs contract[36] and in products strict liability cases.[37]
Both types of cases, of course, lie at the boundary of tort and contract law. The reason for the rule in products liability cases is that when a product causes only economic loss,[38] a commercial user of the product is best left to his contractual remedies. Bay State-Spray & Provincetown S.S., Inc. v. Caterpillar Tractor Co., 404 Mass. 103, 109-10 (1989). In the typical products liability case where the economic loss rule is applied, a product that the defendant manufactures *232 proves defective, and the purchaser bears costs to repair the product, and usually suffers from loss of business as well. See, e.g., id. at 104. The economic loss rule is justified because a “commercial user can protect himself by seeking express contractual assurances concerning the product (and thereby perhaps paying more for the product) or by obtaining insurance against losses.” Id. at 109-10. In contrast, a person physically injured by the product “had neither the bargaining power nor the opportunity to bargain” to protect himself. Id. at 110. See also Restatement (Third) of Torts: Products Liability §21(1997).
In my view, the economic loss rule does not compel dismissal of this case for several reasons.
First, Plaintiffs’ allegations here differ from those in cases where the economic loss rule was applied. Insofar as the complaint states allegations under products liability law, this case is dissimilar to the typical products suit discussed above. The reasons supporting application of the economic loss rule to strict products liability actions, essentially risk-allocation principles, do not apply to the allegations in this case with the same force as in the usual products liability action. See Clark, 428 Mass, at 342 (refusing to apply the economic loss rule to legal malpractice, the Court stated, “When the economic loss rule has been applied, the parties usually were in a position to bargain freely concerning the allocation of risk, and, more importantly, there was no fiduciary relationship”). To the extent the complaint states allegations analogous to the other line of cases applying the rule (interference with a contract or economic opportunity), Plaintiffs allege that it was foreseeable that they would suffer harm. Also, Plaintiffs have an interest in the safety and welfare of the residents of Boston. Accord Priority Finishing Corp., 40 Mass.App.Ct. at 721 (noting that bailee of damaged property not barred by economic loss rule from recovering for financial harm because “the plaintiff s pecuniary losses are derived from physical harm to property for which the plaintiff has a right to recover”).
Secondly, while the allegations of harm in this case include economic harm, they are not limited to that type of harm. See, e.g., Compl. at par. 76 (Plaintiffs incurred “public costs”); at par 83 (Plaintiffs incurred “enormous costs in support of the public welfare”); at pars. 107 & 120 (loss of productivity of individuals harmed).
Finally, as noted, the uniqueness of the allegations of this case counsels against dismissal at the pleading stage.[39]
IV. The Aggregation Issue
Defendants next argue that the complaint must be dismissed because it improperly aggregates claims that individually could not survive the pleading stage, that are too “amorphous” and that are “factually diverse independent claims.” As to the argument that the complaint improperly combines separate claims that are individually deficient, I defer discussion to the substantive claims (see pages 30 to 41).
Defendants' second argument is that the complaint is vague because Plaintiffs have brought suit “on the basis of some amorphous injury to unspecified citizens linked in only general terms to some amorphous wrong by a group of defendants.” I disagree. In my view, the complaint meets basic notice pleading requirements.
Defendants’ third argument is that this action is an effort to aggregate factually and legally diverse individual claims as a strategic effort to bypass the difficulty of proving causation or the existence of a tort, and to overcome affirmative defenses. Defendants misconstrue Plaintiffs’ allegations. As noted in the discussion of “remoteness,” Plaintiffs do not seek to aggregate multiple claims of individuals and recover on their behalf. Rather, Plaintiffs, two government bodies who have advanced various theories of liability, claim that Defendants' conduct caused harm to them. The harm alleged, including costs for preventative measures, youth intervention programs, increased security at schools and other public buildings and emergency rescue services, is not the same as harm to individuals.
V. Home Rule Amendment and Preemption
In their analysis of the Home Rule Amendment to the Massachusetts Constitution, Defendants advance two distinct arguments. First, they argue that Plaintiffs lack authority to bring this action under the Home Rule Amendment, Mass. Const. Art. Amend. 2, §6 (“HRA”). Secondly, they claim that this action is preempted by the Massachusetts Firearms Act, G.L.c. 140, §§121 et seq.
Turning first to the Home Rule Amendment, the Legislature provides municipalities with the express statutory right to sue and be sued. G.L.c. 40, §2.[40] It is well established that cities and towns have authority to initiate suits to recover damages under tort and contract theories.[41] See, e.g., Town of Middleborough v. Middleborough Gas & Elec. Dep't, 422 Mass. 583, 585 (1996).
Defendants’ Home Rule[42] argument is premised on a misinterpretation of Plaintiffs’ claims. According to Defendants, Plaintiffs claim “statutory authority to regulate through litigation.” Plaintiffs, however, do not seek to regulate but rather assert common law and statutorily based claims. The terms “ordinance” and “by-law” found in the Home Rule Amendment are not so broad as to encompass civil actions like this case. That the courts of the Commonwealth have recognized the existence of tort and contract actions by municipalities, before and after ratification of the Home Rule Amendment, belies such an expansive interpretation.[43]
In their reply brief, Defendants seek to distinguish between a city acting in “corporate capacity” and one *233 acting in its “government capacity.” Thus, Defendants argue, the language in G.L.c. 40, §2 (allowing a town— and, through §1, a city — to sue “in its corporate capacity,” does not allow a city to sue in its “governmental capacity.”[44] This argument simply repeats the contention that Plaintiffs are seeking to regulate by lawsuit.
Defendants next argue that this action is preempted by the Massachusetts Firearms Act, G.L.c 140, §121 et seq., and by state regulations regarding firearms, 940 Code Mass. Regs. §§16.00 et seq. (regulations promulgated under G.L.c. 93A). In support of this argument, Defendants recite the standard for determining whether a local ordinance or by-law is inconsistent with and thus preempted by a state statute. See Boston Gas Co. v. City of Newton, 425 Mass 697, 699 (1997).[45] They argue that the Firearms Act is so comprehensive that the court should infer a legislative intent to preempt the field.[46]
Defendants’ argument falls because this is a tort and contract case, not a suit about a local by-law or ordinance. The issue before the court is not whether the statute and regulations preempt an ordinance or by-law, but whether the statute abrogates this state’s common law of tort and contract and the relevant portions of the Uniform Commercial Code relating to warranties. “(A]n existing common law remedy is not to be taken away by statute unless by direct enactment or necessary implication.” Eyssi v. Lawrence, 416 Mass. 194, 199-200(1993) (quoting Ferriter v. Daniel O’Connell’s Sons, 381 Mass. 507, 521 (1980)). See also General Elec. Co. v. Department of Envtl. Protection, 429 Mass. 798, 804-05 (1999). “Moreover, ‘[a] statute is not to be interpreted as effecting a material change in or repeal of the common law unless the intent to do so is clearly expressed.’ ” Eyssi, 416 Mass. at 200 (quoting Riley v. Davison Constr. Co., 381 Mass. 432, 438 (1980) (alteration by Riley Court)); Hopkins v. Medeiros, 48 Mass.App.Ct. 600, 610 (2000). Defendants cite no authority, and the court has found none, stating that the Firearms Act or the regulations clearly express an intent to abrogate the common law, or that they do so by necessary implication.[47]
VI. The Commerce Clause Issue
Defendants next argue that this suit is barred by the Commerce Clause.[48] U.S. Const. Art I, §8.[49] The affirmative grant to Congress of authority to regulate interstate commerce encompasses a “dormant” limitation on the authority of states to enact legislation affecting interstate commerce. Healy v. Beer Inst., 491 U.S. 324, 326 n 1 (1989). In this respect, the Commerce Clause “precludes the application of a state statute to commerce that takes place wholly outside of the State’s borders, whether or not the commerce has effects within the State,” id. at 336 (quoting Edgar v. MITE Corp., 457 U.S. 624, 642-43 (1982)), and bars “a statute that directly controls commerce occurring wholly outside the boundaries of a State regardless of whether the statute’s extraterritorial reach was intended by the legislature,” id. (quoting Brown-Forman, Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573, 579 (1986)). “(T]he practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also . . ., how the challenged statute may interact with the legitimate regulatory regimes of other States . . .’’ Id.[50] The applicability of the Commerce Clause to causes of action under state tort and contract law is unsettled.
The standard for analysis under the Commerce Clause has its focus on positive law — statutes or regulations. See CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 87 (1987) (“The principal objects of dormant Commerce Clause scrutiny are statutes that discriminate against interstate commerce”).[51] With one exception, none of the cases Defendants cite as conducting a Commerce Clause analysis involve application of a remedy by a court after finding defendants liable under state tort and contract law. See, e.g., Healy, 491 U.S. at 326 (Connecticut statute); Brown-Forman Distillers Corp., 476 U.S. at 584 (New York statute), Kassel v. Consolidated Freightways Corp. of Delaware, 450 U.S. 662, 679 (1981) (Iowa statute); Hughes v. Oklahoma, 441 U.S. 322, 323 (1979) (Oklahoma statute); Hunt v. Washington State Apple Adver. Comm’n. 432 U.S. 333, 354 (1977) (Washington statute); Dean Foods Co. v. Brancel, 187 F.3d 609, 620 (7th Cir. 1999) (Wisconsin regulations); Knoll Pharm. Co. v. Sherman, 57 F.Sup.2d 615, 623 (ND.Ill. 1999) (Illinois statute).
Nonetheless, the Supreme Court did state, in BMW of N. America, Inc. v. Gore, 517 U.S. 559, 572 (1996), that Commerce Clause principles apply in some civil suits, although the Court recognized that state civil suits may proceed even though the result may be to effect a change in out-of-state practices.[52]'[53] In BMW of N. America, the plaintiff alleged that failure to disclose that the new automobile he purchased in Alabama had been damaged and repainted constituted fraud under Alabama law. The repainting occurred in Georgia, and the nondisclosure was due to a nationwide BMW policy not to advise car dealers of repairs to new cars if the repair cost was no more than 3 percent of the suggested retail price. After trial, the jury awarded the plaintiff compensatory damages and $4 million in punitive damages. The plaintiff argued that the large punitive damage award was necessary to change BMW's policy nationwide.
The Supreme Court held that “a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors’ lawful conduct in other States.” Id. at 572 (footnote omitted). Economic penalties (in the form of legislatively authorized fines or judicially imposed punitive damages) “must be supported by the State’s interest in protecting its own consumers and its own economy.” Id. Thus, Alabama could not “punish BMW for conduct that was lawful where it occurred and that had no impact on *234 Alabama or its residents,” and could not “impose sanctions on BMW in order to deter conduct that is lawful[54] in other jurisdictions.” Id. at 573. Applying notions of fairness,[55] the Court concluded that the punitive damages award was grossly excessive.
Thus, the Supreme Court never held that the plaintiffs suit in the BMW case was barred by the Commerce Clause. In fact, the Court appeared to take for granted that the suit was proper, as would legislation have been obtaining the same result:
No one doubts that a State may protect its citizens by prohibiting deceptive trade practices and by requiring automobile distributors to disclose presale repairs that affect the value of a new car. But the States need not, and in fact do not, provide such protection in a uniform manner. Some States rely on the judicial process to formulate and enforce an appropriate disclosure requirement by applying principles of contract and tort law. Other States have enacted various forms of legislation . . . The result is a patchwork of rules representing the diverse policyjudgments of lawmakers in 50 States.
That diversity demonstrates that reasonable people may disagree about the value of a full disclosure requirement.
Id. at 568-70 (footnotes omitted). What the Supreme Court held to be improper was, in part, seeking to change BMW’s conduct in other states. Id. at 572. See also id. at 572 n. 18 (“The record discloses no basis for [the plaintiffs] contention that BMW could not comply with Alabama’s law without changing its nationwide policy”).
Here, Plaintiffs allege violations of longstanding state law and seek remedies specific to these violations. Plaintiffs seek compensatory, not punitive, damages, which the Supreme Court never questioned in BMW oJN. America.[56] Certainly, some of the expansive injunctive relief Plaintiffs seek (e.g., to enjoin “manufacturing, distributing, or offering for sale firearms without appropriate safety devices and warnings, including devices designed to prevent unauthorized use”) can be read to seek directly to impact out-of-state conduct. However, as I have previously emphasized, all I now decide is a motion to dismiss for failure to state a claim. The scope and constitutionality of any remedy, should Plaintiffs succeed at trial, is appropriately left to the judge who will have the benefit of a full factual record.[57] The court then will also be able to determine whether the intent of any of the proposed remedies is to deter or punish for out-of-state conduct, or whether the intent is to protect residents of Boston. See BMW of N. America, 517 U.S. at 572-73 [58]
The contention that the allegations of the complaint violate the Commerce Clause is also weakened by the existence of the Firearms Act, G.L.c. 140, §§121 et seq., and the Attorney General’s regulations, 940 Code Mass. Regs. §§1600 et seq. Defendants have not attempted to argue why maintaining this action violates the Commerce Clause while the Firearms Act and the regulations do not.
VII. The Substantive Claims
Finally, Defendants argue that each of the six counts in the complaint is legally deficient.
Public Nuisance
A public nuisance is an “unreasonable interference with a right common to the general public.”[59] Restatement (Second) of Torts §821 B( 1) (1979) (quoted in Leary v. Boston, 20 Mass.App.Ct. 605, 609 (1985)).
Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:
(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or
(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or
(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, • and. as the actor knows or has reason to know, has a significant effect upon the public right.
Restatement (Second) of Torts §821B(2). A public nuisance differs from a private nuisance: “It is a much broader term and encompasses much conduct other than the type that interferes with the use and enjoyment of private property” W. Page Keeton et al., Prosser and Keeton on the Law of Torts §90, at 643 (5th ed, 1984). Thus, in its broadest statement, the concept of a public nuisance “seems unconnected to place or property.” Leary, 20 Mass.App.Ct. at 609.
Liability for a public nuisance may arise even though a person complies in good faith with laws and regulations. Hub Theaters, Inc. v. Massachusetts Port Auth., 370 Mass. 153, 156 (1976): Strachan v Beacon Oil Co., 251 Mass. 479, 488 (1925).
Liability extends to all who join or participate in the creation or maintenance of a public nuisance. Attorney Gen. V. Baldwin, 361 Mass. 199, 208 n.3 (1972).
Defendants argue that Plaintiffs’ claim fails because it does not arise from activities on or related to property. However, as noted, a public nuisance is not necessarily one related to property. Defendants also argue that the claim fails because Plaintiffs cannot allege that the manufacturers owned or had control of the land or instrumentality that caused the harm, citing Belanger v. Commonwealth, 41 Mass.App.Ct. 668, 670 n.3 (1996). Belanger, however, addressed private nuisance, which is, as noted, distinct from public nuisance.[60] Defendants also cite Commonwealth v. Mead, 153 Mass. 284, 286 (1891). In Mead, a criminal case, the nuisance alleged was the keeping of a tenement used for the sale of intoxicating liquors. *235 As such. Mead was a case where the nuisance was one connected with property, but the case does not hold that the connection is required. See id. at 286.[61] Plaintiffs allege that Defendants created and supplied an illegal, secondary market in firearms. The “instrumentality" which Plaintiffs allege Defendants controlled is the creation and supply of this secondary market.[62]
Review of the complaint shows that Plaintiffs allege Defendants intentionally and negligently created and maintained an illegal, secondary firearms market. They further allege that this market unreasonably interfered with public rights by (1) significantly interfering with the public safety, health, or peace, (2) producing permanent or long-lasting harm and (3) undermining Massachusetts firearms law, making enforcement of those laws difficult or impossible. Compl. Pars. 79 & 81,[63] Thus, the complaint alleges sufficient facts to state a claim for public nuisance.[64] To be sure, the legal theory is unique in the Commonwealth but, as previously noted, that is not reason to dismiss at this stage of the proceedings.
Negligent Distribution and Marketing
Defendants argue that Plaintiffs’ claim for negligent distribution and marketing fails because, as a matter of law, Defendants did not owe Plaintiffs a duty to protect from the criminal acts of third parties.[65] Here, too, Defendants misconstrue the complaint. Plaintiffs do not allege that Defendants were negligent for failure to protect from harm but that Defendants engaged in conduct the foreseeable result of which was to cause harm to Plaintiffs.[66]
To recover for negligence, a plaintiff must show that the defendant owed the plaintiff a legal duty; the defendant breached that duty; and that this breach actually and proximately caused injury Davis v Westwood Group, 420 Mass. 739 742-43 (1995). The existence of a duty is a question of law. Id. at 743; Bergendahl v Massachusetts Elec. Co., 45 Mass.App.Ct. 715, 722-23 (1998), rev, denied, 428 Mass 1111, cert. denied, 120 S.Ct. 326 (1999). “In determining whether the law ought to provide that a duty of care is owed by one person to another, we look to existing social values and customs, and to appropriate social policy. A basic principle of negligence law is that ordinarily everyone has a duty to refrain from affirmative acts that unreasonably expose others to a risk of harm.” Yakubowicz v. Paramount Pictures Corp., 404 Mass. 624, 629 (1989) (citation omitted).
Taking Plaintiffs’ allegations as true, Defendants have engaged in affirmative acts (i.e., creating an illegal, secondary firearms market) by failing to exercise adequate control over the distribution of their firearms. Thus, it is affirmative conduct that is alleged — the creation of the illegal, secondary firearms market. The method by which Defendants created this market, it is alleged, is by designing or selling firearms without regard to the likelihood the firearms would be placed in the hands of juveniles, felons or others not permitted to use firearms in Boston. Further, according to the complaint, Defendants did this depending upon precisely that result, realizing that Plaintiffs would be harmed. Taken as true, these facts suffice to allege that Defendants' conduct unreasonably exposed Plaintiffs to a risk of harm.[67] Worded differently, the Plaintiffs were, from Defendants’ perspective, foreseeable plaintiffs.[68] Thus, the court need not decide whether Defendants owed a duty greater than the basic duty.[69],[70]
Breach of Warranty — Defective Design
The complaint alleges that Defendants breached the implied warranties of merchantability and of fitness for a particular purpose, by way of defective design, by failing to incorporate certain devices.
In Massachusetts, a warranty that goods are merchantable is implied in every sale of goods.[71] G.L.c 106, §2-314. Defendants assert two reasons why this count should be dismissed. They argue (1) knowing and deliberate misuse is a complete bar to recovery and (2) Plaintiffs are not in privity with Defendants.[72]
Under the doctrine of unreasonable use, “a plaintiff s knowing and unreasonable use of a defective product is an affirmative defense to a defendant’s breach of warranty.” Colter v. Barber-Greene Co., 403 Mass. 50, 60 (1988) Apart from this affirmative defense, as an element of their claim Plaintiffs must prove that at the time of their injuries Defendants' products were being used “in a manner that the defendant seller, manufacturer, or distributor reasonably could have foreseen.” Allen v Chance Mfg. Co., 398 Mass. 32, 34 & n. 1 (1986). See Correia v. Firestone Tire & Rubber Co., 388 Mass. 342, 357 (1983).’ As to the latter, Plaintiffs have put forth sufficient allegations to survive this motion to dismiss. See Compl. at pars. 93 & 95.[73] As to the former, the affirmative defense, Defendants carry the burden of proof, and they have not shown that, on the facts alleged, Plaintiffs cannot prove any set of facts which would entitle them to relief.[74] See Nader, 372 Mass, at 98.
As to Defendants’ privity argument, G.L.c 106, §2-318 provides in relevant part;
Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer, seller, lessor or supplier of goods to recover damages for breach of warranty, express or implied, or for negligence, although the plaintiff did not purchase the goods from the defendant if the plaintiff was a person whom the manufacturer, seller, lessor or supplier might reasonably have expected to use, consume or be affected by the goods.
(Emphasis added.)
On its face, then, the relevant statute does not require privity between Plaintiffs and Defendants in this case, as Plaintiffs allege that Defendants could *236 reasonably have expected (or actually knew) that Plaintiffs would be harmed by their goods. See Jacobs v. Yamaha Motor Corp., USA., 420 Mass. 323, 328 (1995) (explicit language of G.L.c 106, §2-318, invalidates claim that privity is required for plaintiff to sue motorcycle manufacturer). The decision in Sebago, Inc., 18 F.Sup.2d at 99, is not to the contrary. Sebago, Inc., predicting Massachusetts law, read Jacobs as being limited to “consumer goods,” and ruled that privity is required when a contract-based warranty claim arises from a commercial transaction. Id. In this case, Defendants do not argue that the firearms were purchased through commercial transactions. See also Thayer v. Pittsburgh-Corning Corp., 45 Mass.App.Ct. 435, 440, rev. denied 428 Mass. 1109 (1998) (no privity required for worker injured by asbestos to sue asbestos manufacturer).
Breach of Warranty — Failure to Warn
Plaintiffs also allege that Defendants breached the implied warranties of merchantability and fitness for a particular purpose by failing to provide adequate warnings or instructions. Defendants argue that this count must be dismissed because Plaintiffs lack privity and because the dangers posed by firearms are “open and obvious.” The court has already addressed the privity argument in the context of the count alleging defective design.
A product’s manufacturer has a duty to warn foreseeable users of latent dangers in the product’s normal and intended use. Vassallo v. Baxter Healthcare Corp., 428 Mass. 1, 23(1998); Carey v. Lynn Ladder & Scaffolding Co., 427 Mass. 1003, 1003 (1998); Bavuso v. Caterpillar Indus., Inc., 408 Mass. 694, 699 (1990). There is no duty to warn, however, where the danger is obvious or where the plaintiff appreciated the danger substantially to the same extent as a warning would have provided. Carey, 427 Mass. at 1004.
In this case, Plaintiffs allege that Defendants failed adequately to warn or instruct, e.g., as to risks that children could obtain access to the firearms, that a gun’s chamber may contain a round of ammunition, as to proper storage of guns to prevent suicide, accidents, or theft, that guns can be fired with the ammunition magazine removed and without pulling the trigger, that the guns may not contain safety devices, that a gun in the home dramatically increases rather than decreases risk of injury to household members, that training is needed to handle guns safely and that improperly stored guns could be stolen. Compl. at par. 103. This failure to warn, Plaintiffs allege, was the proximate cause of Plaintiffs’ injuries. Id. at par. 106.[75]
Defendants reference no case where on a motion to dismiss for failure to state a claim it was decided that, as a matter of law, the danger was obvious or that it was appreciated to the same extent as if a warning had been supplied. See Carey, 427 Mass. at 1003 (summary judgment); Bavuso, 408 Mass. at 694 (jury trial); Bell v Wysong & Miles Co., 26 Mass.App.Ct. 1011, 1012 (1988) (jury trial); Killeen v. Harmon Grain Prods. Inc., 11 Mass.App.Ct. 20 21 (1980) (directed verdict for defendant); Wasylow, 975 F.Sup. at 378 (summary judgment); Bolduc v Colt’s Mfg. Co., 968 F.Sup. 16, 17 (D.Mass. 1997) (summary judgment).[76]
Defendants do not argue that they have no duty to warn of any of the dangers presented by firearms. The court does not have before it any evidence of the warnings that were provided, from which the court could determine whether, as a matter of law, adequate warnings were provided. Defendants are, in essence, asking this court to take judicial notice that the dangers posed by firearms discussed in paragraph 103 of the complaint are so obvious (or were actually appreciated) such that warnings or instructions were not required. This is contrary to Plaintiffs’ allegations, and the court declines to do so.
Negligence
In this count of their complaint, Plaintiffs allege that Defendants negligently designed, marketed, distributed and sold their products. Compl. at par. 111. Inasmuch as this states a claim for negligent distribution and marketing, it is duplicative of Count II and is dismissed. However, this count states a claim not previously stated, for negligent design.
“A manufacturer is under a duty to design its product with reasonable care to eliminate avoidable dangers. The manufacturer must anticipate the environment in which the product will be used and design against reasonably foreseeable risks attending the product's use in that setting. The duty is placed on the manufacturer because it stands in a superior position to recognize and cure defects in its product's design." Simmons v. Monarch Mach. Tool Co., 413 Mass. 205, 211(1992) (citations omitted).
In this case, Plaintiffs have alleged that Defendants were negligent in their design of firearms by failing to include adequate safety devices and failing to include adequate warnings. Such a claim is distinct from the breach of warranty counts. Uloth v. City Tank Corp., 376 Mass. 874, 875 (1978). See J.R. Nolan & L.J. Sartorio, Tort Law §307 (2d ed. 1989 & 2000 Supp.). Because Defendants have only argued for dismissal of this count on grounds that it is duplicative, the court need not test the sufficiency of the allegations further.
In sum, the court dismisses Count V to the extent it alleges negligent distribution and marketing, but denies Defendants’ motion as to the claim for negligent design.
Unjust Enrichment
In the final count of the complaint, Plaintiffs allege that Defendants have been unjustly enriched because they have “reaped substantial profits and gains” from their conduct, causing Plaintiffs’ harm.
A claim that a party has been unjustly enriched seeks the equitable remedy of restitution. Keller v. O’Brien, 425 Mass. 774, 778 &n.8. (1997). Restitution *237 is appropriate when the circumstances of receipt or retention of a benefit “are such that, as between the two persons, it is unjust for [one] to retain it." Keller, 425 Mass. at 778 (quoting National Shawmut Bank v Fidelity Mut. Life Ins. Co., 318 Mass. 142, 146 (1945)). “A person confers a benefit upon another if he in anyway adds to the other's security or advantage. ” 9 Mass. Jurisprudence §2:5 (1993) (citing Restatement of Restitution §1, cmtb).
Here, Plaintiffs allege that they have conferred a benefit upon Defendants by paying for the costs of the harm caused by Defendants’ conduct (“externalities”). See White, 97 F.Sup.2d at 2000 WL 664176, at *10. Plaintiffs further allege that Defendants undertook the alleged wrongful conduct for the purpose of increasing their profits. Thus, Plaintiffs state a claim for unjust enrichment.
CONCLUSION
The parties in this case have pressed upon the court public policy considerations which they believe the court should consider. Defendants, in urging the court to look behind the allegations in the complaint, which they describe as “politicized rhetoric and conclusory allegations,” emphasize that they are not the ones “truly responsible” for the harm. Plaintiffs put forth examples of the devastating effects of gun violence. It is not this court’s function, on a motion under Rule 12(b)(6), to decide whether public policy requires that the complaint proceed or that it be dismissed. Rather the court’s inquiry is limited to deciding whether the complaint fails to state a claim upon which relief can be granted.
ORDER
For the foregoing reasons, Defendants’ motion to dismiss is ALLOWED as to Count V to the extent that count alleges negligent distribution and marketing. Defendants’ motion to dismiss is DENIED as to Count V to the extent it alleges negligent design. As to all other counts, the motion to dismiss is DENIED.

This action is one of a number of similar suits brought throughout the United States. See Note, Recovering the Costs of Public Nuisance Abatement: The Public and Private City Sue the Gun Industry, 113 Hav.L.Rev. 1521 (2000).

The six counts are: public nuisance (Count I); negligent distribution and marketing (Count II); breach of warranty through a design defect (Count III); breach of warranty through failure to warn (Count IV); negligence (Count V); and unjust enrichment (Count VI).

defendants Beretta, Colt’s and Phoenix Arms have filed a third-party complaint against China North Industries Corp./Norinco and Denel (Pty) Ltd.

defendants removed this action to federal court. That court remanded the case. See City of Boston v. Smith & Wesson Corp., 66 F.Sup.2d 246 (D.Mass. 1999).

A11 references in this decision to the complaint are to the First Amended Complaint.

In this decision I place no reliance on the settlement agreement between Smith & Wesson and certain public entities, which was submitted to the court after the hearing on this motion.

Plaintiffs allege that these crimes from 1996 through 1998 include 30 homicides, 131 aggravated assaults, 37 armed robberies and 29 suicides.

Plaintiffs allege that over 1,400 guns were involved in the crimes cited in note 9. They also allege that from July 1, 1996 through July 31, 1998, 1,470 guns were seized by the Boston Police Department and that from January 1, 1993 through November 30, 1998, the firearms recovered were made by the individual defendants in the following numbers: Beretta USA (102), Browning Arms (35), Bryco Anus (138), Charter Arms (29), Colt’s Mfg. (138), Davis Industries (100), Firearms Import & Export (48), Glock (89), Harrington & Richardson (100), Hi-Point (27), Interarms (6), Lorcin (121), Marlin (51), Mossberg (73), Navegar (27), Phoenix (90), Remington (39), Savage (45), Smith & Wesson (369), Sturm & Ruger (167), Sundance (15) and Taurus (56). Plaintiffs allege additionally that thousands of guns used in crime in Boston remain unrecovered.

While Plaintiffs frame many of their allegations in terms of acquisition and use of guns by juveniles and criminals. Plaintiffs refer to “all other classes prohibited from acquiring or possessing guns, such as illegal aliens, fugitives, drug addicts, persons committed to mental institutions, and persons under domestic violence restraining orders.” Pls.’ Mem. at 5 n.4 (citing 18 U.S.C. §922; G.L.c. 140, §129B).

Plaintiffs allege that surveys indicate that juveniles and convicted criminals can easily obtain firearms. Plaintiffs do not allege that the surveys were of Boston respondents. This survey evidence is, according to Plaintiffs, continued by a study by the Federal Bureau of Alcohol, Tobacco and Firearms (“ATF”), which found that in Boston over a one year period (Plaintiffs do not state which year) 11 percent of guns traced to crime were seized from juveniles, while the figure for the previous year was 14 percent. The ATF also found (presumably based on national data) that more guns traced to crime are seized from persons in the age group of 18, 19, and 20 years than any other three-year age group. Also presumably based on national data, the ATF found that over 45 percent of seized weapons were possessed illegally by felons. Finally, as additional evidence of an ease of movement of firearms into an illegal market, Plaintiffs allege that there is a short time interval between retail sale and criminal use of a significant percentage of firearms. Between 40 and 44 percent of guns traced to crime seized in Boston had been sold at retail less than three years earlier, which Plaintiffs allege to be evidence of trafficking.

Plaintiffs allege 15 incidents of examples of Defendants' misconduct.

According to Plaintiffs, traces by the ATF of guns involved in crimes (where the ATF contacts the manufacturer, who provides the name of the distributor) provides Defendants with actual notice that the distribution system supplies guns to an unlawful market. The ATF data further indicates that a very high percentage of guns traced to crime have been "funneled through” a small set of federally licensed dealers. Plaintiffs cite statements allegedly made by Robert Hass, former Senior Vice President of Marketing and Sales for Smith & Wesson, and Robert Lockett, 1993 (firearms) Dealer of the Year, to the effect that the gun industry knows that their guns seep into an illegal market but takes no action to prevent this.

To restrict or impede the únlawiul flow of firearms into Boston, Defendants could have (Plaintiffs allege) taken the following “reasonably available" steps:
(1) adequately investigate or screen distributors and dealers through which Defendants distribute and sell firearms;
(2) adequately monitor, supervise, regulate, and standardize distributors' and dealers' methods of distributing and selling firearms;
(3) conduct research (or heed existing research) to better monitor and control the flow of firearms to the illegal, secondary market, and implement preventative strategies;
(4) “establish a tighter and more direct distribution system in which Defendants remain in control of the distribution of their lethal products”;
(5) adequately train and encourage distributors and dealers to act lawfully and responsibly to ensure compliance with law:
(6) direct distributors and dealers to refuse to sell firearms when the distributor or dealer knows or should know that the firearm likely will not be used for lawful purposes;
(7) require distributors and dealers not to sell more than one handgun per month to any person not holding a federal firearms license, and to track sales to enforce this restriction:
(8) require distributors and dealers to sell only to retailers who stock guns for sale from retail stores, and not to sell guns over the Internet, at gun shows, or to “kitchen table” dealers;
(9) require distributors and dealers to certify compliance with all firearms laws and to provide documentation of sales employees’ and sales agents’ eligibility to sell guns;
(10) require distributors and dealers to carry a specified minimum amount of liability insurance coverage at all times;
(11) refrain (and require distributors and dealers to refrain) from rewarding sales persons or purchasers based on sale or purchase volume;
(12) require distributors and dealers to meet reasonable and specified security requirements to prevent theft;
(13) require distributors and dealers to maintain computerized inventory tracking programs containing information concerning the acquisition and disposition of every gun, and enforce this requirement;
(14) require distributors and dealers to maintain records of trace requests initiated by law enforcement agencies, and to report those requests to the firearm manufacturer;
(15) track and analyze trace requests from law enforcement agencies to determine where and when in the distribution chain the gun may have been diverted to crime, and take preventative measures to reduce diversions; and
(16) institute effective training, monitoring, and sanctions to enforce these requirements (including disciplining or terminating distributors and dealers Defendants know or should know distribute firearms to the illegal market or in an illegal or unsafe manner).

Plaintiffs allege that 23 percent of unintentional shooting deaths nationwide per year occur because the gun user is unaware that the gun is still loaded with ammunition. Plaintiffs allege that this is one reason that the firearm death rate for children aged 14 and under is 12 times higher in the United States than the combined rate in 25 other industrialized countries. According to Plaintiffs, about 35 percent of all unintended shooting deaths occur where the user of the gun is between ages 13 and 16. during which adolescents are attracted to accessible guns and discount the risks of handling a firearm. Plaintiffs claim that the risk that a potentially suicidal adolescent will kill himself doubles if a gun is kept in the home; a person aged 10 to 19 years commits suicide with a gun even’ six hours; guns are used in 65 percent of male teenager suicides and 47 percent of female teenager suicides, and firearm-related suicides account for about 81 percent of the increase in the rate of suicide among 15 to 19 year-olds from 1980 to 1992. In each allegation summarized in this footnote, Plaintiffs allege that some of the events described occurred in Boston.

Plaintiffs allege that there are guns in about half the homes in the United States.

Plaintiffs allege that each year a number of children in Boston are injured or killed because Defendants’ firearms are sold without the means to prevent their use by unauthorized users, without adequate warnings and without adequate instruction regarding the importance of proper firearm storage.

According to Plaintiffs, the referenced studies indicate that one out of three handguns is kept loaded and unlocked in the home; guns kept in the home for self-protection are 22 times more likely to kill or injure someone known by the owners than an intruder; a gun is used for protection in fewer than two percent of home invasion crimes when someone is home and for every time a gun in the home was used in a legally justifiable shooting, there were four unintentional shootings, seven criminal assaults or homicides and 11 attempted or completed suicides. Compl. at par. 72.

Defendants discuss “remoteness" as if it were a freestanding doctrine. The case law, however, considers remoteness as an element of either standing or proximate cause. Defendants do not separate their standing and proximate cause arguments. For purposes of clarity, tire court addresses Defendants’ arguments in terms of proximate causation, but the analysis is equally applicable to standing principles.

The Second Circuit Court of Appeals described the notion of proximate cause as “an elusive concept.” Laborers Local, 191 F.3d at 235. The United States Supreme Court noted that “the principle of proximate cause is hardly a rigorous analytic tool.” Blue Shield of Va. v. McCready, 457 U.S. 465, 477 n.13 (1982).

The Second Circuit stated in Laborers Local that, in addition to the remoteness doctrine, other elements of proximate cause are the requirements of proof that the defendant’s acts were a substantial cause of the injury and that the plaintiffs injury was reasonably foreseeable. 191 F.3d at 235-36. Defendants' argument in this case rests solely on the remoteness inquiry.

The parties have referred the court to no Massachusetts case articulating this doctrine as clearly as the cases previously discussed in the text. Anthony v. Slaid, 11 Met. (52 Mass.) 290 (1846), appears (insofar as the cases the parties discuss) to be the source of the doctrine. This court assumes, for purposes of this motion, that the doctrine is still recognized in Massachusetts.

The .case was characterized as “classic” in Seafarers Welfare Plan v. Philip Morris, 27 F.Sup.2d 623, 628 (D.Md. 1998).

The party responsible was the attacker’s husband. Anthony, II Met. (52 Mass.) at 290.

See Associated Gen. Contractors of Cal., Inc. v. California Store Council of Carpenters, 459 U.S. 519, 532 n.25 (1983) (quoting 1 J. Sutherland, Law of Damages 55-56 (1882)) ("[wlhere the plaintiff sustains injury from the defendant’s conduct to a third person, it is too remote, if the plaintiff sustains no other than a contract relation to such a third person, or is under contract obligation on his account . . .”) (emphasis added & deleted).

The Second Circuit held:
[Plaintiffs’] damages are entirely derivative of the harm suffered by plan participants as a result of using tobacco products . . . Being purely contingent on harm to third parties, these injuries are indirect.
Laborers Local. 191 F.3d at 239.

As Defendants note, numerous other cases bar recover}' where the harm the plaintiffs allege is wholly derivative of harm to third persons. A large number of these cases involve suits by health benefit funds against tobacco manufacturers and their public relations, lobbying and research firms. In these cases, the harm to the funds (increased expenses) was found to be too remote, as it derived entirely from harm to third persons (the smokers). See, e.g., Texas Carpenters Health Benefit Fund v. Philip Morris, Inc., 199 F.3d 788, 788-99 (5th Cir. 2000); International Bhd of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris, Inc., 196 F.3d 818, 827 (7th Cir. 1999); Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.. 185 F.3d 957, 963-64 (9th Cir. 1999), cert. denied. 120 S.Ct. 789 (2000); Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 932-33 (3d Cir. 1999), cert. denied, 120 S.Ct. 844 (2000); Massachusetts Laborers’ Health & Welfare Fund v. Philip Morris, Inc., 62 F.Sup.2d 236, 246 (D.Mass. 1999); Laborers' & Operating Eng’rs' Util. Agreement Health & Welfare Trust Fund v. Philip Morris. Inc.. 42 F.Sup.2d 943, 948 (D.Ariz. 1999); Seafarers Welfare Plan v. Philip Morris, 27 F.Sup.2d 623, 630 D.Md. 1998). Coyne v. American Tobacco Co., 183 F.3d 488, 494-95 (6th Cir. 1999), is slightly different and imports the remoteness doctrine into the context of standing of taxpayers to sue. A number of these cases also suggest that the health benefit funds sustained no injury (not even a remote injury), as the costs were ultimately passed on to others with the funds being mere “financial intermediaries.” International Bhd. of Teamsters, 196 F.3d at 823-25. See also Seafarers Welfare Plan, 27 F.Sup.2d at 627-28. Not all courts follow these cases. See Service Employees Int’l Union Health & Welfare Fund v. Philip Morris, Inc., 83 F.Sup.2d 70, 86 (D.D.C. 1999). Even within the circuits that decided the above-cited cases, lower courts have found factual distinctions that allow similar claims to proceed beyond the motion to dismiss stage. See National Asbestos Workers Medical Fund v. Philip Morris, Inc., 74 F.Sup.2d 221, 225-28 (E.D.N.Y. 1999).

Additionally, and apart from the generalized allegations found throughout the complaint that Plaintiffs have suffered harm, Plaintiffs allege the following.
As for Count I (public nuisance): Defendants “have caused damage to the public health, the public safety and general welfare of the Boston residents, and have thereby wrongfully caused the plaintiffs to incur enormous costs in support of the public health, safety and welfare. The presence of illegitimately possessed and used firearms in Boston proximately results in significant costs to plaintiffs to enforce the law, arm its police force and to treat the victims of firearms.” Compl. at pars. 83 & 84.
As for Count II (negligent distribution and marketing): Defendants’ conduct has caused Plaintiffs “to expend substantially more resources than [they] otherwise would in the form of police services, fire services, emergency medical services, pension benefits, disability benefits, workers’ compensation benefits, health care, expenses to provide additional security measures in public schools and other public facilities.” Id. at par. 88.
As for Count III (breach of warranty by defective design): “the plaintiffs have paid and will continue to pay increased sums of money for police services, law enforcement, fire and rescue services, indigent health care, emergency medical services and other emergency services, pension benefits, disability benefits, workers’ compensation benefits, health care, prison costs, increased security and other services in the public schools and other necessary facilities and services due to the threat of or actual use of the defendants’ firearms . . . Furthermore. . . . Boston has suffered from diminished tax revenues and property values.” Id. at pars. 97 & 98.
As for Count IV (breach of warranty by failure to warn): Plaintiffs repeat, in substance, the allegations of pars. 97 & 98. see id. at pars. 106 & 108, and allege that “Boston has suffered firom the lost productivity of certain citizens and employees harmed as a result of the use of defendants’ products and suffered a direct loss of revenue from lost tax revenues due to diminished property values in areas of Boston where defendants’ products are used.” Id. at par. 107.
As for CountV (negligence): Plaintiffs repeat, in substance, the allegations of pars. 97 & 98. See id. at pars. 115 & 116.
As for Count VI (unjust enrichment): Plaintiffs repeat, in substance, the allegations of par. 97, see id. at par. 119, and allege that they have been harmed by “the loss of substantial tax revenues as a result of diminished property values, loss of businesses and lost productivity of those individuals harmed by guns, due to the presence and use of guns throughout Boston.” Id. at par. 120.

In their reply brief. Defendants misconstrue the remoteness doctrine as that doctrine was applied in Anthony and in the other cases discussed in Defendants’ original memorandum. In the reply brief, Defendants state that “if firearms never were misused by such third parties to inflict direct injury on other third parties, [Plaintiffs] would have no cause to incur any of the claimed expenses.” Defs.’ Reply Mem. at 4. The remoteness doctrine is concerned with harm that is solely derived from injury to another rather than harm that is caused by persons other than the defendant. Plaintiffs allege that it was Defendants' misconduct that caused Plaintiffs’ harm. Defendants’ briefs do not raise the argument that their liability is barred by the intervening criminal (or tortious) acts of third persons.

The most recent Massachusetts case cited was decided in 1934. See Ross v. Wright, 286 Mass. 269, 273 (1934).

In their memorandum, Defendants seek to persuade the court that, should the complaint stand, a veritable Pandora’s box would be opened, because cities would be allowed to sue automobile manufacturers on the theory that vehicles are made so as to be able to violate speed laws and sue liquor manufacturers on the theory that Scotch bottles are capable of being opened and the contents consumed by underage drinkers. These examples misconstrue Plaintiffs’ allegations. Plaintiffs allege that Defendants’ misconduct (i.e., allegedly fueling and exploiting an illegal firearms market and allegedly manufacturing defective and unreasonably dangerous products) caused Plaintiffs to suffer the harm discussed in the text. An apt analogy, to use Defendants’ illustration, would be allegations that the alcohol industry exploited and relied upon an illegal, secondary market of underage drinkers and sold defective products, causing harm. In other words, it is not the mere manufacture and sale of a lawful product of which Plaintiffs complain, but rather the tortious manufacture and sale.

Defendants also argue that “practical and equitable considerations” reinforce their position. Defs.’ Mem. at II. It is true that, in the context of the proximate cause analysis under the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, the Supreme Court identified three rele *240 vant factors: (1) the difficulty of ascertaining the amount of damages attributable to the misconduct rather than to some other source; (2) the difficulty of apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to prevent multiple recoveries; and (3) whether suits by directly injured victims would vindicate the general interest in deterring injurious conduct. Holmes, 503 U.S. at 269-70. The difficulty in ascertaining damages in this case ts best assessed when the case has gone beyond the pleading stage. For purposes of the pending motion, the complaint contains sufficient allegations of harm to survive. While Defendants characterize their connection to the alleged wrongdoing as being shippers of products that made their way, “by a series of legal and illegal acts beyond the manufactures’ control," to persons who misused them, Defs.' Mem. at 13, Plaintiffs allege that Defendants could have exercised control over the distribution of their product. E.g., Compl. at pars. 59-60.

In their original memorandum. Defendants state that the rule articulated in the Freetown case “is a corollary of the ‘fireman’s rule.’ ” Defs.’ Mem. at 15 n.2. Subsequently, the Appeals Court stated that “the firefighter’s rule has no continuing vitality in Massachusetts.” Hopkins v. Medeiros, 48 Mass.App.Ct. 600, 608-09 (2000). In their supplemental memorandum, Defendants argue that the fact that the Commonwealth no longer follows the firefighter’s rule “has no effect on the continued vitality of the municipal cost recovery' doctrine, as applied by the Supreme Judicial Council [sic] in Freetown." Defs.’ Supp. Mem. (dated June 1, 2000), at final (unnumbered) page of argument section. The court does not rule on the relationship between the firefighter’s rule and the Freetown doctrine.

The authors state:
Two generalizations underlie the numerous exceptions [to the economic loss rule]. First, the common rationale for allowing recovery of purely economic losses is formability. Second, the degree to which a defendant knew or should have known the extent of the consequences of negligent conduct, including economic loss, plays a dispositive role in a court's holding, more knowledge means more culpability.
One differentiating factor between those cases allowing recovery and those denying recovery is foreseeability; that is, recovery hinges on whether a defendant could foresee that the negligent conduct would cause harm to a specific person, known class of persons, or foreseeable persons under the circumstances.
Palmueri & Barret, supra, at 761-62, 765 (footnotes omitted).

See FMR Corp. v. Boston Edison Co., 415 Mass. 393, 395 (1993) (plaintiffs claimed defendants’ negligent conduct caused plaintiffs to sustain damages from loss of income and increased costs of doing business); Garweth Corp., 415 Mass, at 305 (plaintiff claimed defendant’s conduct caused plaintiff to sustain monetary losses in connection with contract); Stop & Shop Cos. v. Fisher, 387 Mass. 889, 893 (1983) (plaintiff claimed that defendant’s negligence in striking bridge caused economic injury to plaintiffs). See also Restatement (Second) of Torts §7660(1979).

See Marcil v. John Deere Indus. Equip. Co., 9 Mass.App.Ct. 625, 630-31 (1980) (plaintiff claimed manufacturing defect in construction equipment caused plaintiff business losses). See also Restatement (Third) of Torts: Products Liability §21(1997).

“Economic loss” in the products liability setting is “the cost of repairs and lost profits.” Bay State-Spray & Provincetown S.S., Inc. v. Caterpillar Tractor Co., 404 Mass. 103, 107 (1989). The Appeals Court defined “economic loss" as including “damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits without any claim of personal injury or damage to other property . . .” Marcil, 9 Mass.App.Ct. at 630 n.3 (quoting Alfred N. Koplin & Co. v. Chrysler Corp., 49 Ill.App.3d 194, 199 (1977)).

Defendants’ argument that the economic loss rule requires dismissal of the claims for public nuisance and unjust enrichment is without merit, as the rule does not appear to apply to such claims. See Garweth Corp., 415 Mass. at 306.

General Laws c. 40, §2 provides:
A town may in its corporate capacity sue and be sued by its name, and may appoint necessary agents therefor.
This reference only to “town” is complemented by G.L.c. 40. §1, which makes clear that §2 applies to cities as well. Section 1 states:
Cities and towns shall be bodies corporate, and, except as otherwise expressly provided, shall have the powers, exercise the privileges and be subject to the duties and liabilities provided in the several acts establishing them and in time acts relating thereto. Except as expressly provided, cities shall have all the powers of towns and such additional powers as are granted to them by their charters or by general or special law, and all laws relative to towns shall apply to cities.

 Of course, the Boston Public Health Commission is the second plaintiff. However, Defendants make no separate argument as to the commission’s authority to be a plaintiff, and they treat both plaintiffs the same. In the complaint, Plaintiffs rely on G.L.c. 111, §122 (and Append. 2-4 & 2-5), for the commission’s authority to sue.

Article 89 of the Amendments to the Constitution of the Commonwealth was ratified in 1966. and is commonly known as the Home Rule Amendment. This replaced the existing Article 2. At present. Article 2 of the Amendments, section 6, reads in full:
Any city or town may, by the adoption, amendment, or repeal of local ordinances or by-laws, exercise any power or function which the general court has power to confer upon it. which is not inconsistent with the constitution or laws enacted by the general court in conformity with powers reserved to the general court by section eight, and which is not denied, either expressly of by clear implication, to the city or town by its charter. This section shall apply to every city and town, whether or not it has adopted a charter pursuant to section three.
General Laws c. 43B, §13 (part of the Home Rule Procedures Act), largely tracks the language of the Home Rule Amendment. Section 13 has ás its subject ordinances or by-laws, and “legislative or executive actions."

In a footnote in their reply brief, Defendants argue that while G.L.c. 40, §2 empowers municipalities to sue and be sued in their own names, the scope of that empowerment derives from some other authority, such as the Home Rule Amendment. This argument has no merit. As noted, cities and towns have long had the authority to initiate tort and contract actions. The court does not believe that c. 40, §2 requires that there exist specific statutory or constitutional authorization as to every asserted tort or contract cause of action before a city or town may initiate a suit. Defendants cite no authority to support that position.

The sole Massachusetts authority on which Defendants rely to support this distinction is Higginson v. Treasurer & Sch. House Comm’rs of Boston, 212 Mass. 583 (1912). Higginson held that the legislature had authority to designate city parkland as the site for a school building. The Court stated that there existed two characters of city and towns, a governmental capacity and a capacity similar to a private corporation. Id. at 585. Defendants make this distinction, apparently, to suggest that G.L.c. 40, §2 only allows municipalities to sue in their “corporate capacity” (i.e., acting in the nature of a private corporation), and not in their “governmental capac *241 ity." Regardless which capacity Plaintiffs are suing in, the cases discussed plainly allow contract and tort suits to be brought by municipalities. Defendants cite no Massachusetts case barring suit and relying on the distinction made in Higginson. In Slama v. Attorney Gen., 384 Mass. 620. 623-24 (1981), the Court made a different distinction and suggested that “corporate capacity’' meant a municipality acting as a distinct entity, and “representative capacity'” meant a municipality acting as a representative of its citizens, the actual rightholders, for whom it would be difficult or impossible to assert claims.

To determine whether an ordinance or by-law is inconsistent with state law. the Court asks (1) whether there was an express legislative intent to forbid local activity on the same subject, (2) whether the local regulation would frustrate the purpose of a statute so as to warrant an inference that the Legislature intended to preempt the subject or (3) whether legislation on the subject is so comprehensive that legislative intent to preempt can be inferred, as any local enactment would frustrate the statute’s purpose. Boston Gas Co., 425 Mass. at 699.

Defendants make no separate argument in relation to the regulations in 940 Code Mass. Regs. §§16.00 et seq.

I do not intend anything in this decision to affirm the propriety of the injunctive relief Plaintiffs seek. Any such comment would be highly premature.

Defendants frame their argument in terms of the Commerce Clause, In one paragraph of their memorandum, Defendants discuss Due Process principles, in connection with BMW of N. America, Inc. v. Gore, 517 U.S. 559 (1996). Because the thrust of this portion of their memorandum clearly focuses on a Commerce Clause argument, the court declines to read this paragraph of defendants’ memorandum as raising a Due Process argument any broader than the doctrine discussed in BMW of N. America.

Clause 3 of Art. I, §8, grants Congress the power “To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes!.]”

The United States Supreme Court has summarized its two-tiered approach as follows:
When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State’s interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.
Healy, 491 U.S. at 337 n. 14 (quoting Brown-Forman Distillers Corp., 476 U.S. at 579) (citations omitted).

See also Dennis v. Higgins, 498 U.S. 439, 447 (1991) (Commerce Clause is limitation on “the power of the States to enact laws imposing substantial burdens on [interstate] commerce”) (quoting South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 87 (1984); alteration added).

The Court stated: “State power may be exercised as much by a jury’s application of a state rule of law in a civil lawsuit as by a statute.” BMW of N. America, 517 U.S. at 572 n. 17. The Court cited New York Times Co. v. Sullivan, 376 U.S. 254, 265 (1964) (relating to defamation and First Amendment), and San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 247 (1959) (relating to displacement of state jurisdiction under National Labor Relations Act).

The Court’s statements in this regard may properly be characterized as dicta, since the Court assumed that the ultimate damage award of $2 million (after remittitur by the Alabama Supreme Court) was based only on conduct occurring in Alabama and held that even this award was grossly excessive. BMW of N. America, 517 U.S. at 574. Thus, the Commerce Clause discussion was not necessary to the Court’s analysis. See id. at 604 (Scalia, J., dissenting): id. at 607 (Ginsburg, J., dissenting).

The Supreme Court did not consider whether a State may attempt to change a tortfeasor’s unlawful conduct in another state. BMW of N. America, 517 U.S. at 573 n.20.

While the Supreme Court discussed notions of fairness enshrined in “constitutional jurisprudence,” the Court appeared to rely on Due Process. BMW of N. America, 517 U.S. at 574 n.22.

See BMW of N. America, 517 U.S. at 576 (“But this observation [that infliction of economic injury may warrant a substantial penalty] does not convert all acts that cause economic harm into torts that are sufficiently reprehensible to justify a significant sanction in addition to compensatory damages”).

Defendants point out that the alleged diversions into an illegal firearms market can occur anywhere in the country and thus an injunction could have the effect of forcing Defendants to change its practices nationwide. Again, an argument as to the scope of injunctive relief, should such an argument be necessary and should injunctive relief be deemed appropriate, is best addressed at a later stage of litigation. Also, as noted, the Supreme Court has left open the question whether a state may attempt to change a tortfeasor’s unlawful conduct in another state. BMW of N. America, 517 U.S. at 573 n.20.

Defendants state that, according to the complaint, most of the sales of firearms to distributors took place outside Massachusetts. This appears to speak to a personal jurisdiction argument, and Plaintiffs appear to have interpreted it as such. Nevertheless, Defendants in their reply brief emphatically deny that they dispute personal jurisdiction. Defs. ’ Reply Mem. at 32.

See also Planned Parenthood League of Mass., Inc. v. Bell, 424 Mass. 573, 578 n.4, cert. denied, 522 U.S. 819 (1997) (“A nuisance is public when it interferes with the exercise of a public right by directly encroaching on public property or by causing a common injury”) (quoting Connerty v. Metropolitan Dist. Comm’n, 398 Mass. 140, 148 (1986)) (emphasis added): Restatement (Second) ofTorts §821B, cmt. h (“a public nuisance does not necessarily involve interference with use and enjoyment of land .. . When the particular harm consists of interference with the use and enjoyment of land, the public nuisance may also be a private nuisance . . .”).

“A private nuisance is actionable when a property owner creates, permits, or maintains a condition . . . that causes a substantial and unreasonable interference with the use and enjoyment of the property of another.” Belanger, 41 Mass.App.Ct. at 670 n.3 (quoting Asia v. Fitchburg, 24 Mass.App.Ct. 13, 17 (1987)).

 Along similar lines is Massachusetts v. Pace, 616 F.Sup. 815, 821 (D.Mass. 1985), which Defendants also cite. In that case, the federal court held that the defendants did not participate to a substantial extent in the release of chemicals into the ground when the defendants only transported the chemicals to a chemical waste reclamation facility, which did release the chemicals into the ground. Thus, the nuisance in Pace was also of the type connected to property.

In their reply brief. Defendants argue, that, in order to exercise control to abate the nuisance, they would have to “identify! 1 all criminals and disarm! ] them — something neither defendants, nor [Boston] with all its statutory and law enforcement resources can do.” This argument misses the point of Plaintiffs’ allegations. To exercise control to abate the alleged nuisance, Defendants would have to cease maintaining the illegal, secondary market.

Plaintiffs have also alleged that they sustained special or peculiar harm.

In a footnote to their original memorandum. Defendants observe that Plaintiffs have not pled that Boston's Corporation Counsel has initiated this action. Defendants conclude this makes Boston not a proper party'. Defs.’ Mem. at 21 n.5. Under Chapters of the City of Boston Code, the city’s law department is placed under the charge of the Corporation Counsel. The ordinance states in pertinent part that the Corporation Counsel ’’shall, subject to the direction of the Mayor, institute any suit or proceeding in behalf of the City which line shall deem the interest of the City requires; shall by himself or by his assistants in the Law Department appear as Counsel in all suits, actions, or prosecutions which may involve the rights or interests of the Cityt. ]” City of Boston Code, Ordinances, c. 5, §5-8.1 (1985 & 1999 update). Defendants cite no cases or rule of civil procedure, and present no argument as to why the quoted language from the city ordinance requires that the city plead that it has satisfied the ordinance, and why failure to do so requires dismissal. Plaintiffs do not address this issue in their opposition memorandum, and Defendants do not raise it in their reply memorandum or their sur-reply memorandum. See Mass.R.Civ.P. 9(a). Defendants thus have not pressed this issue.

Defendants’ argument is framed in terms of the first element of a negligence action, the existence of a duty of care. However, the penultimate paragraph of this portion of their memorandum speaks of misuse of a firearm as being a bar to recovery. Defs.’ Mem. at 34. This confronts the proximate causation analysis, which is an issue distinct from whether there exists a duty of care. To the extent Defendants argue that liability is barred by the intervening acts of third persons, such an argument fails in Massachusetts if the third person’s acts could have been foreseen, which is what Plaintiffs allege. See Poskus v. Lombardo's of Randolf, Inc.. 423 Mass. 637, 639-40 (1996); Jesionek v. Massachusetts Port Auth., 376 Mass. 101, 105 (1978); Gidwani v. Wasserman, 373 Mass. 162, 166-67 (1977).

PIaintiffs allege that Defendants are jointly and severally liable. Compl. at par. 87. Defendants make no argument against joint and several liability.

The complaint alleges alternatively that Defendants were negligent in failing to inhibit the formation of the secondary market. Failing to prevent an event from happening, if one knows it will occur absent intervention and one desires it to occur, may be the functional equivalent of an affirmative act. However, the court need not decide this issue, as a complaint should not be dismissed “if it would support relief on any theory of law.” Whitinsville Plaza, 378 Mass, at 89 (citations omitted; emphasis is in original).

Foreseeability is sometimes considered an element of the ascertainment of the existence of a duty of care. Whittaker v. Saraceno, 418 Mass. 196, 198-99 & n.3 (1994).

The legislature and the Attorney General have, as noted, established statutory and regulatory rules to prevent the harm Plaintiffs allege. This maybe evidence of “existing social values and customs, as well as [ ] appropriate social policy,” Davis, 420 Mass. at 743, from which a different duty can be inferred. The court does not reach this issue. Cf. Tobin v. Norwood Country Club, Inc., 422 Mass. 126, 133 (1996) (“Determinations of public policy, especially when a statute ‘undoubtedly’ identifies such a policy, are highly relevant to [the initial inquiry, whether the defendant owed a duty of care]”); Michnik-Zilbernman v. Gordon’s Liquor, Inc., 390 Mass. 6, 11 (1983) (“Once a vendor places liquor in the hands of a minor, it may set in motion the very harm which the Legislature has attempted to prevent”).

Plaintiffs also allege that Defendants were negligent in marketing their products by failing to educate consumers regarding the risks of firearms, representing that purchase of a firearm will enhance household security, representing that firearms are safe and representing that families could safely store firearms unlocked and accessible to minors or mentally impaired persons, causing additional harm to Plaintiffs. Compl. at par. 89. Defendants make no argument relative to these allegations, and the court does not address them.

Defendants do not argue that the implied warranty of fitness for a particular purpose does not apply. G.L.c. 106, §2-3 15.

As these are the only grounds for dismissal of this count urged by Defendants, the court confines its discussion to these two issues. In their reply brief, Defendants for the first time appear to raise the argument that the guns were not "defective.” See Defs.’ Reply Mem. at 27. The argument, in its entirety, is as follows: “When a product is deliberately functioned [sic] to accomplish a known and intended result, the product is not defective and liability is not extended to the manufacturer.” Defendants reference a footnote in their original memorandum. That footnote argues that misuse of a firearm constitutes a superseding cause, negating a finding of proximate causation. Defs.’ Mem. at 27 n.9. Thus, Defendants present no argument as to why the firearms were, as a matter of law, not “defective” under warranty law. The court notes that the complaint contains sufficient allegations that Defendants' products were defective. See, e.g., Compl. at par. 94. See Commonwealth v. Johnson Insulation, 425 Mass. 650, 660-61 (1997) (discussion of breach of implied warranty of merchantability).

While these paragraphs of the complaint allege that. Defendants reasonably could have expected that Plaintiffs would have been injured by Defendants’ defectively designed guns (and thus speaks to the foreseeability of harm rather than foreseeability of use), the facts alleged in the complaint, if proven, would show that Defendants reasonably could have foreseen the use to which their products were put. See, e.g., Compl. at pars. 53-55 (alleging, in substance, that Defendants reasonably should have known that their guns were being used by the secondary, illegal market to inflict harm by gun violence).

The court acknowledges that the breach of warranty by defective design claim seeks to apply warranty law in a way unlike past cases. The typical breach of warranty case involves allegations that the defendant’s product, used in a reasonably foreseeable way, harmed the plaintiff-user. In such a situation, the defendants may assert the affirmative defense that the plaintiff acted unreasonably toward a product he knew to be defective and dangerous. Here, however, Plaintiffs were not the users, a difference which raises novel questions of law regarding the affirmative defense of unreasonable use. These questions are better addressed in the context of a factual record. Cf. Bolduc v. Colt’s Mfg. Co. 968 F.Sup. 16, 18 (D.Mass. 1997) (deciding, at summary judgment, that plaintiffs decedent’s deliberate misuse of firearm barred recovery on negligent design claim).

Paragraph 106 of the complaint mentions by name only the implied warranty of merchantability. It does, however, reference G.L.c 106, §2-315, the implied warranty for fitness for a particular purpose.

Mavilia v. Stoeger Indus., 574 F.Sup. 107, 111 (D.Mass. 1983), was a case involving a handgun decided on a motion to dismiss under Fed.R.Civ.P. 12(b)(6). That case does not appear to have involved allegations of failure adequately to warn. Applying what it perceived to be Massachusetts law as it then existed, the federal district court decided that the .38 caliber Llama automatic pistol was not inherently defective and declined to certify the issue to the Supreme Judicial Court. Id. & n.5. The allegations in Mavilia were different from Plaintiffs’ allegations in this case.